608 So.2d 1274 (1992)
Clyde E. WHITTINGTON
v.
Wilmena W. WHITTINGTON, Thomas G. Kleinpeter, Thomas G. Kleinpeter, Jr., Kathleen Kleinpeter Humphries, Judith Kleinpeter Zito, Harry William Kleinpeter, Gregory Wayne Kleinpeter and Deborah Kleinpeter Gelpi.
No. 07-CA-59434.
Supreme Court of Mississippi.
August 31, 1992.
Rehearing Denied December 3, 1992.
*1276 H.B. Mayes McGehee, McGehee McGehee & Torrey, Meadville, Bert H. Jones, McComb, William Timothy Jones, Jackson, for appellant.
David B. Gross, Kirkland Barfield Panter & Moore, Jackson, Bryan C. Harbour, Robison & Harbour, McComb, for appellees.
En Banc.
SULLIVAN, Justice, for the Court:
This cases involves a dispute between husband and ex-wife (and her assigns) over a 1/2 of 1/8 royalty payable out of the production from Whittington No. 12 Well in the Southwest East Fork Field of Amite County, Mississippi. Perfectly logical application of established law to the facts requires that we find the judgment of the lower court correct in all material respects.

I.
The relevant facts, which have been stipulated by both parties, are not complex. On November 26, 1984, Santa Fe Energy Company filed an application for permit to drill Whittington No. 12 Well on an 80 acre unit in the Southwest East Fork Field of Amite County, Mississippi. This 80 acre tract was acquired by T.E. and Annabelle Whittington in 1928. A permit was issued on November 27, 1984, and the Whittington No. 12 Well was completed as a producing well on February 26, 1985.
On September 12, 1959, T.E. Whittington, and his wife, Annabelle, conveyed to their son, Clyde, 20 acres of the 80 acre unit. T.E. and Annabelle reserved for themselves the mineral estate in this 20 acres "for the term of their natural lives."
On May 13, 1969, T.E. Whittington and his wife, Annabelle, conveyed to their son, Clyde Whittington, and his wife, Wilmena, 230 acres of land which included 54 acres of the 80 acre tract on which Whittington No. 12 Well was later drilled. This conveyance was by warranty deed and contained the following provisions:
Grantors reserve unto themselves and do not convey a one-half (1/2) royalty interest, (being 1/2 of 1/8 of the whole of any oil, gas or other minerals produced from said lands; delivery of said royalties to be made to the grantors herein in the same manner as is provided for the delivery of royalties by any present or future mineral lease affecting said lands), they to have the same for the rest of their natural lives, and at their death the rights reserved herein shall revert to the grantees.
Grantees herein have the right to grant future leases affecting said lands so long as there shall be included therein, for the benefit of the grantors herein, the royalty rights herein reserved; and the grantees further have the right to collect and retain all bonuses and rentals paid for or in connection with any future lease or accruing under the lease now outstanding.
Also on May 13, 1969, T.E. Whittington and Annabelle conveyed to Clyde and Wilmena by "Mineral Right and Royalty Transfer" (Form R-101) all of their interest "in and to all of the oil, gas and other minerals of every kind and character in, on or under" the 20 acres mentioned above. Recall that in 1959 T.E. and Annabelle conveyed the surface estate of this 20 acres to Clyde, reserving unto themselves the mineral estate. This latest transaction merely conveyed to Clyde and Wilmena the mineral estate which T.E. and Annabelle had earlier reserved for themselves.
By "Royalty Deed" (Form M-18) this same day, May 13, 1969, Clyde and Wilmena conveyed to T.E. and Annabelle a 1/2 of 1/8 royalty interest in any oil, gas or other minerals to be produced from this 20 acres. In part, this "Royalty Deed" stated:
The grantees herein [T.E. and Annabelle] are hereby given a life estate in the above described premises. At the death of the survivor of the grantees, the premises shall revert to the grantors [Clyde and Wilmena].

*1277 The royalty interests and rights herein sold, transferred and conveyed are:
(a) one-half of one-eighth (1/2 of 1/8) of the whole of any oil, gas or other minerals, except sulphur, on and under and to be produced from said lands; delivery of said royalties to be made to the purchaser herein in the same manner as is provided for the delivery of royalties by any present or future mineral lease affecting said lands.
This "Royalty Deed" reserved unto Clyde and Wilmena, as grantors, a bundle of rights, including the right "to grant future leases affecting said lands so long as there shall be included therein for the benefit of the grantee herein, the royalty rights herein conveyed," and the right "to collect and retain all bonuses and rentals paid."
The net result of these transactions was to make Clyde and Wilmena the owners of the surface and mineral estate of 74 of the 80 acres on which Whittington No. 12 Well was later drilled.[1] T.E. and Annabelle retained an interest in a 1/2 of 1/8 royalty in the premises.
T.E. Whittington died on September 2, 1972. On April 9, 1974, Clyde was granted a divorce from Wilmena. On this date, he conveyed to Wilmena by quitclaim deed "all of my right, title and interest in and to" the subject property, with the following provision:
This deed of conveyance is executed subject to all prior mineral rights and royalty transfers and oil, gas and mineral leases heretofore executed by the grantor and his predecessors in title.
Clyde also reserved for himself, his heirs and assigns, a 1/4 of 1/8 royalty interest in all oil, gas and other minerals to be produced from the subject land. All executive rights were granted to Wilmena, and Clyde reserved a 1/4 interest in any cash bonus or other consideration paid for future leases.
On April 3, 1975, Wilmena executed in favor of Edward Launius an oil, gas and mineral lease covering the 80 acre tract on which the Whittington No. 12 Well was later drilled. This lease had a primary term of 10 years, and provided for a 1/8 royalty. Via subsequent assignments, Santa Fe Energy Company acquired an ownership interest in the lease and operated the producing No. 12 Well.
Wilmena, on April 25, 1977, conveyed the subject property to Thomas Kleinpeter by warranty deed, "subject to all prior mineral rights and royalty transfers and oil, gas and mineral leases heretofore executed by the grantor and her predecessors in title." Wilmena also reserved for herself an undivided 1/2 interest in the mineral estate. Kleinpeter subsequently conveyed some of his interests to members of his family.
By virtue of the "subject to" clauses in Clyde's conveyance to Wilmena, and in Wilmena's subsequent conveyance to Kleinpeter, the previously reserved royalty interest of 1/2 of 1/8 in favor of Annabelle Whittington remained undisturbed.
On July 28, 1983, Annabelle executed a "Royalty Deed" (Form M-18) conveying to Clyde the 1/2 of 1/8 royalty interest which had been acquired by her via the May, 13, 1969 transactions. This "Royalty Deed" stated in particular:
It is the intent of the grantor herein to convey and she does hereby convey to her son, Clyde E. Whittington, that certain life estate royalty interest reserved by her in a Warranty Deed dated May 13, 1969, recorded in Book 152 and page 127 and acquired in that certain Royalty Deed dated May 13, 1969, recorded in Book 43, page 85, of the records of Amite County, Mississippi, reference to which is hereby made.
As previously mentioned, the Whittington No. 12 Well was completed as a producing well on February 26, 1985. Annabelle Whittington died on December 4, 1986. Her death terminated the 1/2 of 1/8 royalty interest which she and her husband acquired in 1969, and which she subsequently conveyed inter vivos to Clyde on July 28, 1983.
*1278 Following production, Santa Fe suspended payment of the 1/2 of 1/8 royalty. In response, Clyde Whittington, on January 20, 1987, sought judgment from the Chancery Court of Amite County declaring his rights vis-a-vis the interest he had acquired from his mother in the 1/16 (1/2 of 1/8) royalty. Importantly, Clyde agrees that he, like Annabelle before, is a life tenant as to the 1/2 of 1/8 royalty in question. His claim, variously stated, is essentially that he is not subject to impeachment for waste, and is entitled to receive the whole of all payments attributable to this royalty from the date of first production on February 26, 1985, until Annabelle's death on December 4, 1986.[2]
The chancellor held otherwise. Construing the instruments of conveyance, the chancellor found that T.E. and Annabelle (and subsequently Clyde) held a life estate in the 1/2 of 1/8 royalty attributable to the 80 acre tract (less and except 6 acres). Finding no expressed intent to the contrary, the chancellor held consistent with the common law rule that the life tenant (Clyde) was subject to impeachment for waste, and thus entitled only to interest or income from the royalty corpus, and not the corpus itself. By virtue of the quitclaim deed incident to divorce, Wilmena was vested with the future interests (here, a remainder and a reversion), and thus was entitled to the principal or corpus.

II.
In construing instruments of conveyance, "it is necessary under well recognized rules of construction that they be considered as a whole, and the intent of the parties be gathered from the plain and unambiguous language contained therein." Rogers v. Morgan, 250 Miss. 9, 21, 164 So.2d 480, 484 (1964). "[T]he meaning of the language and intention of the parties to be determined by the Court is to be found in the language used in the instrument." Id.; Pursue Energy Corp. v. Perkins, 558 So.2d 349, 351-53 (1990); see also Simmons v. Bank of Mississippi, 593 So.2d 40, 42-43 (Miss. 1992) [in construing written instruments, "our concern is not nearly so much what the parties may have intended as it is what they said, for the words employed are by far the best resource for ascertaining intent and assigning meaning with fairness and accuracy," quoting UHS-Qualicare v. Gulf Coast Comm. Hosp., 525 So.2d 746, 754 (Miss. 1987)]. Clear, unambiguous instruments must be construed as written Cherry v. Anthony, Gibbs, Sage, 501 So.2d 416, 419 (Miss. 1987). Courts must ascertain the meaning of the language actually used, and not "some possible but unexpressed intent of the parties." Simmons, 593 So.2d at 42-43, quoting Cherry, 501 So.2d at 416. The parties obviously disagree over that meaning, but that fact alone does not render the instruments ambiguous. Id.
On the question of whether the instruments are unambiguous, and if so, their meaning and effect, we review the chancellor's decision de novo for these two issues present questions of law. Lamb Const. Co. v. Town of Renova, 573 So.2d 1378, 1383 (Miss. 1990); Dennis v. Searle, 457 So.2d 941, 945 (Miss. 1984); see also Moore & Munger Marketing and Refining, Inc. v. Hawkins, 962 F.2d 806 (8th Cir.1992); Bennett v. Local Union No. 66, et al., 958 F.2d 1429 (7th Cir.1992).
It seems indisputable, and in fact no one on appeal contests, that the chancellor correctly concluded the instruments of conveyance were clear and unambiguous; the only dispute is over the meaning and effect of these instruments. And for reasons to follow, it seems clear the chancellor correctly construed the instruments in question.

III.
Mississippi adheres to the ownership in place theory which provides that *1279 minerals are capable of ownership in the ground before discovery and extraction, or in place. Thornhill v. System Fuels, Inc., 523 So.2d 983, 986 (Miss. 1988). A royalty is said to arise out of the mineral estate and in turn is considered an interest in land which may be separately conveyed or reserved. Thornhill v. System Fuels, Inc., 523 So.2d at 985; First Nat. Bank of Laurel v. Commercial Nat. B. & T., 247 Miss. 677, 681, 157 So.2d 502 (1963); Martin v. Eslick, 229 Miss. 234, 253, 90 So.2d 635, 641 (1956). The fee owner of a mineral estate "can create by conveyance or reservation a separate estate in the minerals commonly referred to as a royalty interest." Day v. Gibraltar Oil Corporation, 344 So.2d 474, 475 (Miss. 1977). "In general, the types of interests which the landowner may create by grant or reservation in oil, gas and other minerals are leasehold interests, mineral interests, and royalty interests." 1 Williams and Myers, Oil and Gas Law § 202, p. 21 (1989).
Accepting royalty as a separate ownership interest in real property, we have recognized that parties may create, among others, a life estate in a royalty. Hathorn v. Amoco Production Co., 472 So.2d 403, 407 (Miss. 1985); Martin v. Eslick, 229 Miss. 234, 90 So.2d 635 (1956); see also, 1 Williams and Myers, Oil and Gas Law, supra at § 202.3, p. 26; 3A Summers, The Law of Oil and Gas § 572, p. 8 (1958). "Life estate," as used in the context of real property, is merely a type of ownership interest "classified on the basis of duration." 2 Powell on Real Property ¶ 172[1], p. 6 (1989). All real property estates, in fact, are but types of ownership interests classified on the basis of time. Id.

A.
In this case, the 1/2 of 1/8 royalty itself is a classic non-participating royalty. See Mounger v. Pittman, 235 Miss. 85, 86-7, 108 So.2d 565, 566 (1959). The estate which was created by conveyance and reservation in this royalty in 1969, by the plain language of the instruments, is a life estate, with remainder and reversion to Clyde and Wilmena. No one on appeal contests this. In the May 13, 1969 warranty deed conveyance of part of the property from T.E. and Annabelle to Clyde and Wilmena, T.E. and Annabelle reserved unto themselves an interest in a 1/2 of 1/8 non-participating royalty "to have the same for the rest of their natural lives, and at their death the rights reserved herein shall revert to the grantees," Clyde and Wilmena. (Emphasis added).
On that same day, as to another piece of the property, Clyde and Wilmena received an undivided fee interest in the mineral estate, and in turn conveyed back to T.E. and Annabelle by "Royalty Deed," form M-18, an interest in the 1/2 of 1/8 non-participating royalty which they expressly designated as a "life estate," with reversion to Clyde and Wilmena. (Emphasis added).
Finally, on July 28, 1983, Annabelle executed a standard "Royalty Deed," form M-18, conveying to Clyde "that certain life estate royalty interest reserved by her in a Warranty Deed dated May 13, 1969 ... and acquired in that certain Royalty Deed dated May 13, 1969." (Emphasis added). Clyde could acquire no greater ownership interest than Annabelle had, Miss. Code Ann. § 89-1-17 (Rev. 1991), and thus he acquired a life estate. To be certain, he acquired a life estate pur autre vie, or an estate measured by Annabelle's life span, not his. Annabelle is the cestui que vie. 4A Thompson on Real Property § 1897, p. 3, 5 (1979 Replacement).
In sum, the estate in this non-participating royalty which was created by reservation and grant on May 13, 1969, is a life estate, with remainder and reversion to Clyde and Wilmena. It is elementary that an estate whose duration is limited by someone's life is a life estate. 1 Powell on Real Property ¶ 202[1] (1989). "A life estate is an interest in real property, the duration of which is limited by the life of some person." Certainty of duration is irrelevant, and so long as the estate created "can or may continue during a life, it is a freehold or life estate." 4 Thompson on Real Property § 1893, p. 656 (1979 Replacement).
*1280 Furthermore, every life estate is followed by future interests. Such interests are quite evident from the face of the instruments at issue, in the nature of reversion and remainder, thus reinforcing the conclusion that a life estate was created.
The use of the word "revert" in the May 13, 1969 "Warranty Deed" from T.E. and Annabelle to Clyde and Wilmena is, of course, technically incorrect. A reversion is a type of future interest that may be retained only by the grantor; it cannot be created in favor of a third person. It may be expressly reserved, but in any event arises by operation of law when the grantor conveys a lesser estate than he has. 4A Thompson on Real Property § 1975, 1976 (1979 Replacement); 2A Powell on Real Property ¶ 270[2] (1989).
The interest referred to is instead a vested remainder which follows the life estate. A vested remainder is a type of future interest created in favor of an ascertained third person (here Clyde and Wilmena), and is capable of becoming a present possessory interest at the termination of the prior life estate. 4A Thompson on Real Property, supra at §§ 1982, 1984, 1985, 1987; 2A Powell on Real Property, supra at ¶ 272[1], [3]. The error in labeling the interest, however, does not change the character of that interest. And the interests are so similar that this technical error hardly creates any ambiguity in the overall conveyances. In the warranty deed dated May 13, 1969, Clyde and Wilmena acquired a vested remainder in the 1/2 of 1/8 royalty.
On the other hand, the use of the word "revert" in the May 13, 1969 "Royalty Deed" conveyance from Clyde and Wilmena to T.E. and Annabelle is correct. In that conveyance, Clyde and Wilmena transferred an estate of a lesser quantum (a life estate) than they had, and ipso facto retained a future interest in that 1/2 of 1/8 royalty known as a reversion. Upon expiration of the life estate, the reversion becomes possessory.
Both of these future interests are freely transferable. 2A Powell on Real Property, supra at ¶ 275[1], [4]. Here, the remainder and reversion were subsequently conveyed by Clyde via quitclaim deed to Wilmena, who in turn conveyed her interests to Kleinpeter and others.

IV.
To reiterate, no one can or does contest that a conventional life estate royalty interest was created by reservation and grant on May 13, 1969. In this regard, the chancellor was correct. The more important question is whether the life estate pur autre vie subsequently acquired by Clyde entitled him to the corpus of the 1/2 of 1/8 royalty, or interest income only. Put otherwise, was Clyde, as life tenant, subject to impeachment for waste?

A.
A royalty is payment for minerals withdrawn from the land, and represents the principal or corpus. As a general rule, "a life tenant is entitled only to the interest from any investment of such funds where the lease is executed after the execution of the instrument creating the life estate." Hathorn v. Amoco Production Co., 472 So.2d 403, 407 (Miss. 1985); First National Bank of Laurel, 247 Miss. at 681, 157 So.2d 502 (1963); Martin v. Eslick, 229 Miss. at 253, 90 So.2d at 641 (1956). "This view is based on the theory that the royalties are a substituted corpus and must be preserved for the benefit of the owner of the future interest until it becomes possessory." 2 Williams and Myers, Oil and Gas Law § 512.2, p. 643-44 (1989). In this case, the life estate was indeed created prior to the execution of any oil, gas or mineral lease, and thus, we presume the general rule applies.

B.
The general rule is, however, subject to exceptions. One such exception is the so-called open mine doctrine which provides that the life tenant is entitled to the entire royalty, and not impeachable for waste, where a well had either been opened or authorized prior to the creation of the life estate. Youngman v. Shular, 281 S.W.2d 373, 375-77 (Tex.Civ.App. 1955), aff'd. 155 *1281 Tex. 437, 288 S.W.2d 495 (1956); see also Clyde v. Hamilton, 414 S.W.2d 434, 439 (Tex. 1967); 1 Kuntz, Oil and Gas § 8.2 (Thornton Rev. 1987); Martin v. Eslick, 229 Miss. at 253, 90 So.2d at 641 (life tenant may not open new mines). This exception is not applicable here because no lease authorizing the drilling of a well had been executed prior to the creation of the life estate.
A second exception arises where the parties creating the life estate manifest an intent that the life tenant is entitled to the entire royalty, and not just the interest or income from such royalty. Enserch Exploration, Inc. v. Wimmer, 718 S.W.2d 308, 311 (Tex. Ct. App. 1986); 1 Kuntz, Oil and Gas, supra at 8.1, p. 213, 8.4, p. 232; Ouber v. Campbell, 202 So.2d 638, 641 (Miss. 1967) (if the life tenant should receive everything, and not just interest therefrom, all one has to do is say so); 5 Powell on Real Property ¶ 640[1][b] (1989); Cf. Hathorn v. Amoco, 472 So.2d at 407, quoting Welborn v. Tidewater Associated Oil Co., 217 F.2d 509 (10th Cir.1954). Here, do the instruments creating the life estate manifest an intent that the life tenant not be impeachable for waste? The chancellor held they did not:
There is no doubt that a conventional life estate can be created without impeachment for waste, so that the holder would be entitled to the corpus and not the interest only. The question is, was that done in this case?
It would have been very easy to make clear the intent of the parties as to the corpus. No particular form was necessary and any words would be sufficient provided they amount to clear statement of that intent. The cases hold that the intent of the parties as expressed in their creating instruments control their respective rights. See Ouber v. Campbell, 202 So.2d 638 (Miss. 1967), and First National Bank etc. v. Commercial National Bank and Trust Company, etc., [247 Miss. 677] 157 So.2d 502 (Miss. 1963).
The attorney who handled the transaction for the parties in 1969 was competent and knowledgeable, and no doubt was aware of the requirement of law in the event the life tenant was to receive the corpus.
It may well be that T.E. and Annabelle thought they would receive the full royalty during their lifetime. The court can understand how that could be so; however, under the rules of construction, the intent must be determined from the instruments themselves.
In order to resolve the issue therefore, it becomes necessary to look at the instruments in question.
* * * * * *
The provisions contained therein for delivery and the rights to grant future leases are standard provisions of royalty deeds, and while important and necessary, do not, in the opinion of the court, express or indicate an intent as to the corpus.
Annabelle could convey to Clyde no greater interest than she had. In Exhibit 20, which again is a Royalty Deed, Form M-18, she expresses her intent to convey "that certain life estate royalty interest." By this instrument she conveyed to Clyde what she had, no more and no less.
Conclusion
The court can find nothing in any of the instruments indicating an intent that the life tenants were to receive the corpus during their life time without impeachment for waste. There were no words or descriptive terms added by which such an intent could be found. Without a clear expression of that intent, the life tenant is entitled only to the income from the corpus.

C.
The chancellor construed certain instruments which are clearly unambiguous, and found no expressed intent of the parties to distribute the royalty other than according to the general rule previously set forth. In this regard, the chancellor was correct.
The only remotely significant mention in these instruments is the form language[3] *1282 regarding the delivery of the royalty which directed delivery to be "in the same manner as is provided for the delivery of royalties by any present or future mineral lease affecting said lands." This is a common provision providing for the "delivery" of the royalty, such as in kind or in money, and if in kind, by delivery to lessor's credit in a pipeline or into designated tanks provided by the lessor. This provision hardly expresses an intent of the parties regarding the "allocation" of the royalty payments as between the life tenant and future interest owners.
The Oil, Gas and Mineral Lease ultimately executed bears out this obvious conclusion. Paragraph 5 of that lease provides for a royalty on oil of 1/8 "to be delivered at the wells or to the credit of Lessor into the pipe line to which the wells may be connected or into storage furnished by Lessor." That same paragraph goes on to provide that Lessee shall pay market value for gas, 75¢ per long ton for sulphur, and in kind or market value for all other minerals.
Bearing in mind that this royalty interest was reserved/conveyed prior to the execution of any lease, it seems clear that this language merely expresses the parties' intent to abide by the terms of any such future lease with regard to the "delivery" of the royalty.

V.
There are perfectly legitimate reasons to question whether the parties expressed their true intent in writing. But the writings are not at all ambiguous, and therefore, the court can only be concerned with what they actually said, and not with what they didn't say. If their intent was other than as stated, it could have easily been expressed. The judgment of the trial court is affirmed.
AFFIRMED.
HAWKINS, P.J., and PITTMAN, BANKS and McRAE, JJ., concur.
DAN M. LEE, P.J., dissents with separate written opinion joined by ROY NOBLE LEE, C.J.
ROBERTSON, J., dissents with separate written opinion joined by ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PRATHER, J.
DAN M. LEE, Presiding Justice, dissenting:
Today the majority fixates on the labels used in the transactions at issue and reaches a result wholly contrary to the arrangement sought by the parties. There is much to be said for the practice of construing instruments according to the language used therein. The utility of this "rule," however, derives from its obvious tendency to determine the actual intent of the parties. The actual intent is the proper focus of our inquiry. Thus, the "four corners" or "plain language" techniques are useful tools but they must yield when rigid application produces results that are inconsistent with the manifest intent of the parties.
In this case, when the parties through their trusted legal advisor adopted words to memorialize their intent, they unfortunately selected a term ordinarily associated with a particular legal meaning. They did so in an effort to place a durational limit on the royalty interest in question. However, the bundle of rights ordinarily described by the term "life estate" is not at all consistent with the rights the parties intended to create. The majority seizes on the sloppy language used in the transaction and then woodenly applies the rules associated with the proper use of the term "life estate." I cannot join in an opinion that so obviously elevates form over substance. Therefore, I respectfully write to register my dissent.

FACTS
The facts of this case are not disputed and, indeed, were stipulated to by the parties. A recital of the pertinent facts, however, is necessary to an understanding of my disagreement with the majority. At issue is a royalty interest involved in an 80 acre tract of land which comprises the current *1283 Whittington No. 12 Well Unit. The royalty interest came into being by the conveyances described as follows.
On May 13, 1969, T.E. Whittington and his wife, Annabelle Whittington, conveyed to Clyde Whittington and wife, Wilmena Whittington, as an estate by the entirety, with the right of survivorship, and not as tenants in common, by warranty deed, 230 acres of land which included 54 acres of the 80 acre tract of land comprising the current Whittington No. 12 Well Unit. This deed contains a reservation:
Grantors reserve unto themselves and do not convey a one-half (1/2) royalty interest, (being 1/2 of 1/8 of the whole of any oil, gas or other minerals produced from said lands; delivery of said royalties to be made to the grantors herein in the same manner as is provided for the delivery of said royalties by any present or future mineral lease affecting said lands), they to have the same for the rest of their natural lives, and at their death the rights reserved herein shall revert to the grantees.
This deed further provides that the grantees, Clyde and Wilmena Whittington, can grant future leases affecting said lands "so long as there shall be included therein, for the benefit of the grantors herein, the royalty rights herein reserved;" the grantees could collect and retain all bonuses and rentals in connection with any future lease or accruing under the lease then outstanding.
On the same date, May 13, 1969, T.E. Whittington and Annabelle Whittington conveyed to Clyde and Wilmena Whittington, again as an estate by the entirety with the right of survivorship and not as tenants in common, all of their interest in and to all of the oil, gas and other minerals of every kind and character on and under 20 acres of this 80 acre tract of land comprising the Whittington No. 12 Well Unit which T.E. and Annabelle Whittington had reserved in a September 12, 1959, conveyance wherein they had conveyed to Clyde and Wilmena the surface of this 20 acre tract of land.
Again on the same date, May 13, 1969, Clyde and Wilmena Whittington executed a royalty deed conveying to T.E. and Annabelle Whittington as an estate by the entirety, with the right of survivorship, a 1/2 of 1/8 royalty interest in these same 20 acres. This royalty deed provides that
the grantees herein are hereby given a life estate in the above described premises. At the death of the survivor of the grantees, the premises shall revert to the grantors. The royalty interest and rights herein sold, transferred and conveyed are: (a) one-half of one-eighth (1/2 of 1/8) of the whole of any oil, gas or other minerals, except sulphur, on and under and to be produced from said lands; delivery of said royalties to be made to the purchaser herein in the same manner as is provided for the delivery of royalties by any present or future mineral leases affecting said lands... .
The obvious intent of these conveyances was to give Clyde and Wilmena the surface and mineral estates of 74 acres of this 80 acre tract in question, except that T.E. and Annabelle Whittington retained a 1/2 of 1/8 royalty interest for the rest of their natural lives.
Both the reservation by T.E. and Annabelle Whittington of 1/2 of 1/8 royalty in the conveyance of the 230 acres, 54 acres of which are part of this particular 80 acre Whittington No. 12 tract, to Clyde and Wilmena, and the conveyance by Clyde and Wilmena to T.E. and Annabelle Whittington of the 1/2 of 1/8 royalty from the 20 acre tract which is part of this 80 acre Whittington No. 12 tract contain the same language: "of the whole of any oil, gas or other minerals produced from said lands; delivery of said royalties to be made to the grantors herein in the same manner as is provided for the delivery of said royalties by any present or future mineral lease affecting said lands." Clearly the parties were seeking to equally divide the potential royalties for the life of the elder Whittingtons.
The next significant event occurred when Clyde and Wilmena divorced in 1974. On April 9, 1974, the date Clyde was granted a divorce from Wilmena, he conveyed to Wilmena by quitclaim deed all of his land, *1284 including the mineral estate, "subject to all prior mineral rights and royalty transfers and oil, gas and mineral leases heretofore executed by the grantor and his predecessors in title," but reserving 1/4 of 1/8 non-participating royalty. All rights to execute leases were also conveyed to Wilmena in return for 1/4 of any bonus or delay rentals received for the execution of future leases.[1]
By virtue of the "subject to" clause, Clyde's conveyance to Wilmena kept the previously reserved royalty interest with Annabelle Whittington (T.E. Whittington died on September 2, 1972). The Kleinpeters became involved when, on April 25, 1977, Wilmena conveyed to Thomas Kleinpeter all her surface estate and 1/2 of her mineral estate, subject to all prior reservations and leases. Again, Wilmena's conveyance to Thomas Kleinpeter did not disturb Annabelle Whittington's royalty interest.
Annabelle Whittington, on July 28, 1983, conveyed by royalty deed to her son, Clyde, the 1/2 of 1/8 royalty interest which had been reserved in the May 13, 1969, warranty deed conveying the 230 acres and which she had acquired from Clyde and Wilmena on May 13, 1969, in the conveyances concerning the 20 acres, with this language:
It is the intent of the grantor herein to convey and she does hereby convey to her son, Clyde E. Whittington, that certain life estate royalty interest reserved by her in a Warranty Deed dated May 13, 1969, recorded in Book 152 at Page 127 and acquired in that certain Royalty Deed dated May 13, 1969, recorded in Book 43, Page 85, of the records of Amite County, Mississippi, reference to which is hereby made. The royalty interests and rights herein sold, transferred and conveyed are:
(a) one-half of one-eighth (1/2 of 1/8) of the whole of any oil, gas or other minerals, except sulphur, on and under and to be produced from said lands; delivery of said royalties to be made to the purchaser herein in the same manner as is provided for the delivery of royalties by any present or future mineral lease affecting said lands.
Thus Clyde Whittington owned the 1/2 of 1/8 royalty interest when the Whittington No. 12 Well Unit was completed as a producing well on February 26, 1985. However, this royalty interest terminated when Annabelle Whittington died on December 4, 1986.
The issue before the chancery court and before us here is whether or not Clyde Whittington is entitled to receive payment for a 1/2 of 1/8 (1/16) royalty interest on all oil produced from the Whittington No. 12 Well Unit comprising 80 acres (less and except 6 acres) from the date said well was completed on February 26, 1985, until the death of Annabelle Whittington on December 4, 1986, or whether he was entitled to only the income earned from the investment of the proceeds of the royalties during this period. In order to determine this issue, we must determine the nature of the royalty interest reserved and conveyed in 1969 in the conveyances from T.E. and Annabelle Whittington to Clyde and Wilmena Whittington and from Clyde and Wilmena Whittington to T.E. and Annabelle Whittington.

INTENT OF THE CONVEYANCES
Briefly, when construing or interpreting deeds and reservations contained therein, we seek to ascertain and give effect to the intent of the parties. Pursue Energy Corp. v. Perkins, 558 So.2d 349, 351 (Miss. 1990). We begin with the instruments themselves, examining the language contained within the "four corners." Id.; see also Pfisterer v. Noble & Cities Serv. Oil Co., 320 So.2d 383, 384 (Miss. 1975). Our rule in this jurisdiction is that the instruments should be read as a whole. Lackey v. Corley, 295 So.2d 762 (Miss. 1974); Ford v. Jones, 226 Miss. 716, 85 So.2d 215 (1956); Texas Gulf Producing Co. v. Griffith, 218 Miss. 109, 65 So.2d 834 (1953). Where the instruments' substance is clear the intent *1285 of the parties must be given effect. Pursue, 558 So.2d at 352; Sumter Lumber Co. v. Skipper, 183 Miss. 595, 184 So. 296, sugg. of error overruled, 183 Miss. 595, 184 So. 835 (1938).
To reiterate, these conveyances gave Clyde and Wilmena 74 acres of this 80 acre tract in question, including all the minerals, except that T.E. and Annabelle Whittington retained a 1/2 of 1/8 royalty interest for the rest of their natural lives. The reservation by T.E. and Annabelle Whittington of 1/2 of 1/8 royalty in the conveyance of the 230 acres, 54 acres of which are part of this particular 80 acre Whittington No. 12 tract, to Clyde and Wilmena, contains the language: "of the whole of any oil, gas or other minerals produced from said lands; delivery of said royalties to be made to the grantors herein in the same manner as is provided for the delivery of said royalties by any present or future mineral lease affecting said lands."
Likewise, the conveyance by Clyde and Wilmena to T.E. and Annabelle Whittington of the 1/2 of 1/8 royalty from the 20 acre tract which is part of this 80 acre Whittington No. 12 tract contains the same language: "of the whole of any oil, gas or other minerals produced from said lands; delivery of said royalties to be made to the purchaser herein in the same manner as is provided for the delivery of said royalties by any present or future mineral lease affecting said lands." The majority's decision explains this away as form language but its presence is consistent with a common sense view of what the parties were seeking to achieve.
From this language it is clearly the intent of these conveyances that T.E. and Annabelle Whittington were to receive 1 barrel of oil out of every 16 barrels produced or the proceeds from 1 barrel out of every 16 barrels produced for the remainder of their lives. Further, it was clearly the intent of the 1983 conveyance from Annabelle to Clyde that for the rest of Annabelle's lifetime, Clyde would be entitled to receive 1 barrel out of 16 produced or the proceeds from 1 barrel out of every 16 produced.
However, the chancellor decreed that Clyde held the right to receive only the income earned (4,262.23) from the royalty money paid by Santa Fe for the 1/2 of 1/8 royalty instead of the full amount of the royalty ($53,827.87). Under the reasoning of the majority and the chancellor, Santa Fe, as owner, producer, and operator of the oil and gas leases, would not pay Clyde the entire proceeds of the 1/2 of 1/8 royalty but would invest the proceeds of the royalty at some rate of interest that would produce an income and then send him a check for that income only, thereby reducing the amount Clyde would receive for his royalty interest from $53,827.87 to $4,262.23.
This result does great violence to our longstanding practice of construing documents so as to effect the intent of the parties. The instruments and the discussion above clearly show that the term "life estate" was used to limit the time period during which the royalty payments (in total) would be paid to T.E. and Annabelle Whittington and not to limit the quantum of the interest transferred.

CONCLUSION
T.E. and Annabelle Whittington were not life tenants of this 80 acre tract and mineral estate with Clyde and Wilmena as remaindermen. This tract, as part of the 230 acre tract, was clearly conveyed to Clyde and Wilmena, surface, minerals, and all. All T.E. and Annabelle Whittington retained was a 1/2 of 1/8 royalty for the duration of the life of the survivor. But while they possessed the royalty, they "owned" it, in the sense that they shared in the production of oil free of expense, as is the usual situation with any royalty owner, while not sharing in bonus, rental, or executive rights. 2 Williams and Meyers, § 331. By virtue of the 1983 conveyance of the royalty interest from Annabelle to Clyde, Clyde owned this royalty interest until Annabelle's death.
For the reasons discussed above, Clyde Whittington is entitled to receive payment for the 1/2 of 1/8 (1/16) royalty interest on all oil produced from the Whittington No. 12 Well Unit comprising 80 acres (less and *1286 except 6 acres) from the date said well was completed on February 26, 1985, until the death of Annabelle Whittington on December 4, 1986. The judgment below should be reversed and judgment rendered in favor of Clyde Whittington.
ROY NOBLE LEE, C.J., concurs.
ROBERTSON, Justice, dissenting:
The issue today is whether Clyde E. Whittington owns:
(1) One-sixteenth (1/16) of each barrel, gallon or drop of oil produced from the 74 acres of the Whittington No. 12 Well Unit between February 26, 1985, and December 4, 1986 (or the monetary equivalent thereof  said to be some $53,827.87), or
(2) the income, yields or profits reasonably derived from prudent investment of this quantity of oil (or the monetary equivalent thereof  put at only $4,262.23).
The public law is not decisive. It plays but a facilitate role, having provided a service to citizens enabling them to seek and achieve self-chosen ends. That law allowed that the Whittingtons  T.E. and Annabelle, Clyde E. and, in happier times, Wilmena  may have shaped their rights and interests to either of the ends stated above and was and is indifferent to their choice, save only that we respect their freedom to have made it and have it enforced. That the first alternative noted may appear more conventional is of no consequence, lest we confuse the familiar with the necessary. Thornhill v. System Fuels, Inc., 523 So.2d 983, 1005 (Miss. 1988) (Robertson, J., concurring). The primary law we enforce is that made privately by these four citizens in a set of conveyances and reservations.
Annabelle's July 28, 1983, conveyance to Clyde, entitled "Royalty Deed," vested in Clyde what  and all  Annabelle had under two May 13, 1969, conveyances, T.E.'s rights having passed to Annabelle at his death in 1972. In that 1983 conveyance, Annabelle said she was giving Clyde her "life estate royalty interest," but those words so used have no creative power. There is no meaning there, except that Annabelle was giving Clyde what was theretofore hers. The rights Annabelle there conveyed had been created by other prior instruments.
And so we ask what Annabelle had immediately prior to July 28, 1983. The question turns on the best and most coherent reading we may tease from the May 13, 1969, instruments. There is no answer to be found in speculation regarding the nature of oil and gas as property, nor legal interests therein, nor in our prior expositions thereon. The private law is found in no "brooding omnipresence in the sky, [nor in gurgling crude beneath the surface] but is the articulate voice of some sovereign [citizens]... that can be identified." Southern Pacific Co. v. Jensen, 244 U.S. 205, 222, 223, 37 S.Ct. 524, 531, 532, 61 L.Ed. 1086, 1099, 1101 (1917) (Holmes, J., dissenting). These 1969 texts are that voice, and we read these texts and ask what sensible persons making valid conveyances using these combinations of words most likely said. The King's English is our source of meaning, except insofar as law and usage may mandate otherwise. Thornhill, 523 So.2d at 1007-1008.
The 1969 instruments  one by conveyance, the other by reservation  label as "royalty" what T.E. and Annabelle would have thereafter. We trust it is without controversy royalty contemplates a right to (a part of) production. The 1969 instruments speak of one-half (1/2) of one-eighth (1/8) "of the whole," the best rendering of which is that somebody  T.E. and Annabelle  is getting one-sixteenth (1/16) of every barrel, gallon or drop of oil that may be produced on "said lands." The language connotes a fraction of the gross production, as distinguished from the net production derived from a cost-bearing interest.
The problem is the life estate language. No, the problem is the legal mind's penchant for wagging the dog with his tail, for seeing signs suggesting a venerable and useful legal facility and thereupon taking a quantum leap that locks in a host of concepts and consequences, as though they follow inexorably. The itch for certainty and structure infects us all, and often with profit. All too many lawyers find the itch *1287 irresistible and scratch the skin raw. I have never understood this propensity, this seeming inner compulsion, so much a part of the lawyer's fibre, upon finding a legal label language may tend to suggest, to shortcircuit (sometimes difficult) textual analysis and instead import a whole panoply of rights and relationships without regard to whether the text will bear the burden. The Court today succumbs to the siren's song without openly confronting the question what these four sovereign citizens have really provided. Not every use of the words "life estate" or "for the rest of their natural lives" makes a conveyance subject to "impeachment for waste."
A life estate is a familiar notion in the law of property. It is a facility the law affords citizens for arranging their affairs. It is a product of positive, not natural law, and each life estate created is a discrete product of law privately made against the background of the public law in its facilitative role. Persons may create life estates in themselves and others and may use shorthand language en route, and where they have done so familiar attributes emerge and will be enforced. They may define their life interests largely as they wish, here to provide a one-sixteenth (1/16) share of production of oil to the two elder Whittingtons. The lawyer's heaven of concepts is not so ornamented and formal that the mere utterance of the words "life estate" generates an inevitable structure, that vanquishes all contrary thoughts, bringing forth limits and language that may not be there. There may be a finite number and form of estates and interests in land that may be found in the treatises and casebooks, and these may have conventional trappings, but this does not mean the possibilities have been exhausted. The possibilities are checked more by the limits of the mind's imagination and drafting ingenuity than by the positive law.
I am not nearly so concerned about "the essential and determinative characteristic of a life estate" as I am about the essential and determinative character of the particular rights and interests these four Whittingtons did, in fact and in law, create back in 1969. The essential and determinative character we ought seek will never appear to those who would paper it over with such conclusory labeling as "conventional life estate royalty interest," to those who have not yet rid their reason of the tyranny of labels. See Cunningham v. Lanier, 589 So.2d 133, 140 (Miss. 1991) (Robertson, J., concurring); Thornhill, 523 So.2d at 1003.
The parties could have shaped their rights so that the one-sixteenth (1/16) royalty became the corpus and, so that, for the rest of their lives, T.E. and Annabelle enjoyed only the income reasonably the product of prudent investment. But the 1969 conveyance of the twenty acre tract refers to "a life estate," not in any such oily corpus but in "the above described premises." This suggests dry and dirty land. When the instrument is studied, we see that the "above described premises" are the twenty acres, not the one-sixteenth (1/16) part of any oil produced therefrom. The language "at the death of the survivor of the grantees, the premises shall revert to grantors," [emphasis supplied] again belies any idea the life interest is limited to the income of a share of production, the one-sixteenth (1/16) royalty. It is true Clyde and Wilmena did not convey "the above described premises," if you will. They conveyed only "the mineral royalty interest hereinafter set out affecting and relating to the following described lands", viz., the twenty acres, "the above described premises." The "mineral royalty interest" is then "hereinafter set out" as:
The royalty interest and rights herein sold, transferred and conveyed are: (a) one-half of one-eighth (1/2 of 1/8) of the whole of any oil, gas or other minerals... .
The grantees of this sale, transfer and conveyance are T.E. and Annabelle and the language says they are getting one-sixteenth (1/16) of the whole. The life estate language that precedes this declaration modifies only "the above described premises," not the one-sixteenth (1/16) royalty. And the same of what follows: "at the death of the survivor of the grantees [T.E. and Annabelle], the premises shall revert to grantors [Clyde and Wilmena]".
*1288 The 1969 fifty-four acre conveyance is easier. Grantors  T.E. and Annabelle 
reserve unto themselves and do not convey a one-half (1/2) royalty interest (being 1/2 of 1/8 of the whole... [of any production])
The instrument goes on to say T.E. and Annabelle are "to have the same"  surely the one-sixteenth (1/16) royalty, the right to one-sixteenth (1/16) of each drop of oil produced  for how long?, "for the rest of their natural lives." The loaded label "life estate" does not appear. The language simply provides grantors will enjoy this one-sixteenth (1/16) royalty as oil is produced "for the rest of their natural lives." Only a lawyer could confuse these simple words.
There is a further dimension. The two instruments were made the same day  May 13, 1969. They relate to separate parts of the same eighty acre tract of land. Should not two such instruments be read in harmony? The meaning of the fifty-four acre conveyance being apparent, we ask whether any language in the twenty acre conveyance suggests a differing scheme of rights and interests. We do not think it unfair to suggest sensible people pursuing sensible ends sensibly are unlikely  on the same day and at the same time  to give T.E. and Annabelle a one-sixteenth (1/16) royalty for life in fifty-four acres and only the income from a one-sixteenth (1/16) royalty on the adjacent twenty acres. They could have done this, it is true. They could have provided T.E. and Annabelle's interests subject to impeachment for waste. And if they had done so, we should not flinch at enforcement, as the law is indifferent to such personal judgments. Absent a reason why the Whittingtons would want one arrangement for the fifty-four acres and a different one for the twenty acres  and we see none, we think it sensible that the simple sayings of the former conveyance be seen as informing the meaning of the more gothic phrasing of the latter, particularly where the latter is susceptible of the same meaning.
As with the draftsmen of any legal text, we should assume the Whittingtons were in May of 1969 sensible people pursuing sensible ends sensibly, albeit burdened by a less than nimble scrivener. It virtually leaps from the pages of the two instruments that the elder Whittingtons, T.E. and Annabelle, decided to share with Clyde and his wife, fifty-fifty, the one-eighth (1/8) royalty from any production. The life interest language suggests but a garden variety will substitute, the sharing to end with the death of the survivor of T.E. or Annabelle. The best, most coherent and most sensible reading  fitting these texts and flowing from the best justification we may find therefor and the best explanation informed external observers may divine why sensible persons might have written thus, given the objective accessible world  is that post-May 13, 1969, T.E. and Annabelle held the right to receive one-sixteenth (1/16) of the whole of the production of Whittington No. 12 Well Unit for the rest of their lives, which right survived in Annabelle at T.E.'s death.
For these reasons, I respectfully dissent.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PRATHER, J., concur in this opinion.
NOTES
[1] Clyde had acquired the other six (6) acres in 1945 by warranty deed from T.E. and Annabelle. The 6 acres is not involved in this litigation, and the issues on appeal revolve around the royalty interests in the remaining 74 acres.
[2] Because we deal with a claim possibly as between a life tenant and remainderperson or reversioner, the reference here to "the whole of all payments" should hereafter be understood to include (1) the royalty itself (or cash equivalent), and (2) the interest thereon. The oil or gas royalty (or its cash equivalent) is treated as principal or corpus. The principal or corpus is in turn invested to produce interest income payable to a life tenant. See generally 3A Summers, The Law of Oil and Gas, § 613 (1958 and Supp. 1991).
[3] This is standard Form M-18 language.
[1] We have dealt with part of this scenario in another context in an earlier decision, Whittington v. Whittington, 535 So.2d 573 (Miss. 1988).