# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 96-CA-00140-SCT

*IP TIMBERLANDS OPERATING COMPANY, LTD.*
*AND INTERNATIONAL PAPER COMPANY*

*v.*

*DENMISS CORPORATION, JOHN H. HAUBERG*
*1982 LIVING TRUST, ET AL.*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/05/96 |
| TRIAL JUDGE: | HON. JAMES E. GRAVES, JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | PHILLIP A. WITTMANN |
| | JOHN G. CORLEW |
| | EDWIN NEILL, III |
| | JACKIE W. ROZIER |
| | RICHARD C. STANLEY |
| ATTORNEYS FOR APPELLEES: | LUTHER T. MUNFORD |
| | JAMES A. SMITH, JR. |
| | ROSS BASS, JR. |
| | JAMES R. HENNESSEY |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | REVERSED AND REMANDED - 4/2/98 |
| MOTION FOR REHEARING FILED: | 4/16/98 |
| MANDATE ISSUED: | 9/24/98 |

**BEFORE PRATHER, C.J., ROBERTS AND MILLS, JJ.**

**ROBERTS, JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

¶1. IP Timberlands Operating Co., and International Paper Company appeal two orders of the Hinds County Circuit Court. In construing a 1945 lease agreement with a purchase option, Judge James E. Graves, Jr., determined as a matter of law that the purchase option unambiguously called for appraisers to fix the lands' value, although the option expressly provided for arbitrators to fix the value of the lands. Also, Judge Graves determined as a matter of law that the purchase option called

for the lands' value to be appraised as unencumbered from the remainder of the prepaid ninety-nine year lease that runs through 2044. Appellants raise the following issues on appeal:

**I. WHETHER THE CIRCUIT COURT ERRONEOUSLY MADE A NEW CONTRACT FOR THE PARTIES AND VIOLATED THE FEDERAL ARBITRATION ACT?**

**II. WHETHER THE CIRCUIT COURT'S $38,500,000 JUDGMENT, ENTERED WITHOUT AN EVIDENTIARY HEARING OR A TRIAL, WHICH ORDERED IPTO AND IP TO PAY TWICE FOR PROPERTY RIGHTS BOUGHT LONG AGO, DEPRIVED THEM OF PROPERTY WITHOUT DUE PROCESS OF LAW?**

**III. WHETHER THE ORDERS AND JUDGMENT ENTERED BELOW WERE PROCEDURALLY DEFECTIVE?**

## STATEMENT OF THE FACTS

¶2. On October 25, 1945, the Denkmann Lumber Company authorized John H. Hauberg, President, or John D. Shuler, Vice-President, or W. H. Giles, Vice-President, to sell and convey to International Paper Company or Southern Kraft Timberland Corporation, all of the timber, trees, wood and other forest products, of every nature, kind and description, including the future growth thereof, on all or any part of the lands of the Denkmann Lumber Company, for such price and consideration and on such terms and conditions as may be deemed fit and proper by said officers, all without any restrictions or reservations whatsoever.

¶3. On October 25, 1945, Southern Kraft Timberland Corporation, a division of International Paper Corporation, executed an agreement with the Denkmann Lumber Company, in which Kraft leased approximately 140,000 acres of Mississippi land from Denkmann. Also, on the same day, Kraft leased approximately 95,000 acres of Louisiana land in another lease agreement.

¶4. The Mississippi agreement stated that in consideration of $1,000,000 cash paid by Kraft, and a further sum constituting the balance of the consideration, Denkmann thereby:

A

Sell, convey and warrant unto KRAFT all of the timber, trees, wood and other forest products, of every size, kind, character and condition, together with any future growth thereof, during the life hereof standing, lying and being on the lands described in Exhibit A hereto, which is made a part hereof, with full right to KRAFT, its successors and assigns, to enter, cut and remove said timber, trees, wood and other forest products whatsoever, save as hereinafter provided, which may now be, or may hereafter, during the life of this agreement, grow, upon said lands, by virtue of the efforts of KRAFT, its successors or assigns, by natural reforestation or reproduction, or by any cause whatsoever, for the full term of ninety-nine (99) years from this date, subject to the further terms, conditions and reservations hereof.

KRAFT shall have the right to cut and remove timber, trees, wood and other forest products from said property, or from any part thereof, repeatedly, at such times as it may elect, during the life of this contract, and the removal of all or a part of said timber, trees, wood or other

forest products from said property or any portion thereof, one or more times, shall not terminate nor affect KRAFT'S rights at subsequent times to remove timber, trees, wood and other forest products that may be on said property, or that may grow or be grown thereon during the life of this contract, KRAFT being hereby granted full authority to cut and remove any such timber, trees, wood or other forest products now on or which may hereafter grow on any of said lands, and utilize the same for commercial purposes or any other purposes desired by it, and no such cutting or use shall constitute waste, all of which rights are subject to the payment of taxes on the property, or portions thereof, and to the other obligations assumed by KRAFT and reservations made by DENKMANN, as herein set out.

B

Subject to the further terms, conditions and reservations hereof, lease and lot unto KRAFT, with full warranty of title, the said lands for the full term of ninety-nine (99) years from this date, with right to use said lands in the future, during the life of this contract, for the purposes, among others, of growing timber, trees, wood and other forest products, and of promoting the supply, stand and growth of any or all of same on said land, and or removing and marketing the same, from time to time, and at will, the aforesaid consideration covering all such rights and privileges as herein provided, in addition to the conveyance and rights set forth in "A" next above.

The balance of the consideration for which the above sale is made, and for which the lease and future operating and cutting privileges herein set out are granted, is as follows:

At KRAFT'S option, to be exercised by March 1, 1946, (a) the sum of One Million, Two Hundred Fifty Thousand Dollars ($1,250,000) then and there to be paid in cash, or (b) a sum equal to the total price of the timber estimated to be on said lands by a cruise made in the manner hereinafter provided...

The said cruise shall be made by Pomeroy & McGowin, Estimators, of Wilma, Arkansas; provided, however, that should it become apparent that Pomeroy & McGowin will be unable to complete said cruise on or prior to March 1, 1947, either party hereto may notify the other party of that fact and thereupon each party shall nominate one arbitrator and the arbitrators thus nominated shall nominate a third arbitrator, and the said three arbitrators shall thereupon select another firm of estimators, who shall complete said cruise within time limit. In case the two arbitrators appointed by the parties are unable to agree upon the third arbitrator, said arbitrator shall be designated by one of the Judges of the United States District Court for the State of Mississippi...

¶5. Kraft made total payments of $2,250,000 to Denkmann as consideration for the ninety-nine year lease. However, the agreement imposed upon Kraft the duty to pay the annual land taxes, exercise good forestry practices and leave the land reforested for Denkmann at the end of the lease in 2044. Kraft's rights under the lease would terminate if it failed to pay the annual land tax. Also, Denkmann reserved "the right to make and grant any and all oil, gas, gravel and other mineral leases and contracts necessary or desirable to the full mineral development of the said lands".

¶6. Further, the agreement allowed Kraft the right to exercise one of two purchase options for all of the leased Mississippi land. The first was to be exercised on or before March 1, 1946, at a price of $3.50 per acre. The second option stated:

> At any time between January 1, 1986, and December 31, 1995, to purchase all of said lands, not theretofore released from it, at a price to be fixed by three arbitrators to be named at that time - one by DENKMANN, its successors and assigns, one by KRAFT, its successors and assigns, and the third by the two so named; or, in case they shall be unable to agree upon said third arbitrator, said third arbitrator shall be named upon application by either party by one of the Judges of the United States District Courts for the State of Mississippi, after notification to the other party of intent to apply to such Judge for such appointment, given in writing at least thirty (30) days in advance of such application, such amount so fixed to be paid upon execution and delivery of deed conveying such lands, with warranty as in other instance.

> In either event, said deed shall contain full reservation to DENKMANN, or its assigns (Vendor therein) of all minerals and rights therein, and the rights reasonably necessary to full mineral development. Notice of the exercise of either of such options to be given by registered mail.

¶7. The agreement provided that if either of the purchase options were exercised, the deed would contain full reservation to Denkmann, or its assigns of all minerals, and rights reasonably necessary to full mineral development.

¶8. The agreement allowed Kraft and Denkmann to assign their rights and obligations. Although not clear from a review of the record, Denkmann distributed its assets to the distributees before 1960. In 1971, the distributees of Denkmann exchanged their share of the distributed assets for $10 par value stock in the newly formed Denmiss Corporation. Beginning as late as 1960, the Denkmann distributees were represented by Agents and Attorneys-in-Fact, which included Denkmann former President John H. Hauberg, and Vice-President W. H. Giles, among others. Kraft assigned its rights to the International Paper Company, which later transferred its rights to International Paper Timberlands Operating Co., LTD. On February 15, 1996, IPTO transferred its rights and obligations to the purchase option back to IP, which left IPTO with the timber and leasehold estates. For simplicity, all rights and obligations held by IP and IPTO will be referred to as belonging to IP.

¶9. On May 18, 1960, W. H. Giles, former Vice-President and then Agent of the distributees of the Denkmann Lumber Company, contacted the distributees of the Denkmann Lumber Company in regard to the sale of land that was part of the 1945 agreement with Kraft. Giles explained that the Mississippi Legislature had created the Pearl River Valley Water District to construct a dam across the Pearl River a few miles north of the City of Jackson, and that the Water District now wanted to purchase 21,320 acres of Denkmann land to create the reservoir. Giles wrote:

> As you know, the Denkmann lands are under a long term timber lease to International Paper Company, which still has eighty-five years to run. Under this lease the Paper Company is entitled to payment for all merchantable timber and for the value of timber growth for the next eighty-five years. The Denkmann distributees are entitled to some value for the reversionary interest in the land at the end of eighty-five years. All mineral rights will be excepted from the sale.

¶10. Further, Giles explained that the Water District would not separately negotiate with Denkmann and IP, but that IP had reached an agreement with the Water District at a price of $47 per acre. Giles stated that after many weeks of negotiation with IP, the Denkmann Agents and Attorneys-in-Fact agreed to accept $10 per acre for the reversionary interest in the land. The Denkmann distributees approved the agreement, and on August 2, 1960, the Denkmann distributees conveyed a warranty deed to the Pearl River Valley Water Supply District for development of the Ross Barnett Reservoir "subject, however, to the fee simple ownership of all trees, timber and forest products on said lands and their ninety-nine year lease to the surface thereof owned by International Paper."

¶11. On October 7, 1971, Rudy V. Ewing, an Agent for the distributees of the Denkmann Timber Corporation, wrote a letter in regard to the valuation of Denmiss Corporation stock. Ewing wrote, "trying to establish a true value is almost impossible, because the interests traded to the corporation for stock are all reversionary interests." In an April 7, 1972 letter, Ewing again declared that there was no way of arriving at a value for the Denmiss Corporation stock because all of its assets are reversionary interests. On April 12, 1979, Ewing responded to a request to furnish an estimated value stock held in the Denmiss Corporation. In this letter, Ewing stated, "The lands are under a 99 year paid-up lease to International Paper Company."

¶12. On April 30, 1979, John H. Hauberg, former President and then Agent of the Denkmann Lumber Company, wrote to the distributees and successors in interest of Denkmann to inform the group of the purpose of the 1979 business meeting. Hauberg wrote:

> In the immediate years ahead lies the same business that we have been doing since 1945, leasing the mineral rights to oil companies and individual speculators who drill for oil and gas. Beyond these years lies a negotiation with International Paper Company which has the right to buy the lands it is now leasing from us between the years 1985-1995. There should be several million of dollars involved.

> I.P. is in the driver's seat because its lease will not expire until 2044. If it buys our lands, it will not be offering the current market value of the lands that it can have the tree use of for another 50 to 60 years, having paid us for the lease back in 1945.

¶13. On May 31, 1979, Barton L. Bennett, a Registered Forester, wrote to Fred Reimers, an Agent and Attorney-in-Fact for the distributees of the Denkmann Lumber Company. Bennett wrote:

> Within recent months we have had the opportunity of working with two different clients toward the termination of long-term leases and cutting contracts between the clients and large forest industries. Before this, we felt the termination of these instruments would be quite impossible. Legally, it still seems a remote chance to have the contracts broken. But, we now are able to see areas of possible negotiation which may permit the landowners to obtain release of at least part of their lands. With these thoughts in mind, the following discussion will be in the form of an example of the calculations necessary to produce negotiating points for the possible termination of a long-term forest lease.

¶14. Bennett predicted that Denmiss could profit by over $16,000,000 if only 25% of the leased lands were released from the contract. Another letter from Bennett was sent to Reimers to confirm plans to map the leased property, review the tax payments for the property, inspect the property and to make

recommendations.

¶15. On July 8, 1980, the office of John H. Hauberg again referred to the lease agreement as "paid-up" until the year 2044. James H. McCuiston, a minerals agent for the distributees of the Denkmann Lumber Company, in estimates of the value of Denmiss Corporation stock, referred to the IP agreement as a ninety-nine year lease "paid-up" through the year 2044 on January 19, 1983, and again on February 3, 1983.

¶16. On November 20, 1985, Denmiss sent IP a document titled "Notice of Default", in which Denmiss alleges numerous violations of the 1945 Mississippi and Louisiana agreements. Among the allegations is that IP's purchase option, set to begin January 1, 1986, was unenforceable.

¶17. On August 15, 1986, IP filed suit in U.S. District Court, Middle District of Louisiana against Denmiss to confirm its property rights under both the Mississippi and Louisiana agreements. In 1990, federal diversity jurisdiction was destroyed by the United States Supreme Court's decision in ***Carden v. Arkoma Associates.***, 494 U.S. 185 (1990), and the case was dismissed. ***International Paper v. Denkmann Assocs.***, 132 F.R.D. 168 (M.D.La. 1990).

¶18. On March 13, 1990, IP filed suit against Denmiss in the Leake County Chancery Court. On August 15, 1990, Denmiss filed suit against IP in Hinds County Circuit Court. Upon motion, the Leake County Chancery Court transferred suit to the Hinds County Chancery Court. Subsequently, the Hinds County Chancery Court transferred the suit to the Hinds County Circuit Court.

¶19. On May 14, 1991, IP filed their claims in Hinds County Circuit Court. On February 26, 1992, the circuit court entered a scheduling order that consolidated the two suits and created new deadlines for discovery and trial.

¶20. On March 31, 1992, IP exercised the purchase option under the Mississippi agreement and named Russell Milliken as its arbitrator pursuant to the purchase option to fix the purchase price. IP filed amended pleadings seeking specific performance of the option and declaratory relief. IP contended there was "no vagueness or uncertainty" about the meaning of the option, and performance of the option would terminate Denmiss's claims for breach of contract. On September 3, 1992, the circuit court ruled that the purchase option was definite and would be enforced, and denied Denmiss's motions to dismiss. On September 4, 1992, Denmiss agreed to proceed with the arbitration provision pursuant to the lease agreement, but declared that the agreement would not serve as a waiver of its earlier position. Denmiss named William C. Humphries as its arbitrator. On December 9, 1992, Denmiss filed a motion to compel appraisal. On December 22, 1992, IP filed a motion to compel arbitration and to deny Denmiss's motion. On March 3, 1993, Hinds County Circuit Court Judge James E. Graves, Jr., entered an order denying IP's motion to compel arbitration. Also, on March 3, 1993, Judge Graves entered an order to grant Denmiss's motion to compel appraisal of lands. Without releasing the basis of his opinion, Judge Graves stated:

> That the 1945 Agreement entered into between Denmiss Corporation, John H. Hauberg Living trust, et al and International Paper Company and IP Timberlands Operating Company, LTD. contains in Paragraph Number 12 subparagraph b the following phrase "at any time between January 1, 1986, and December 31, 1995 to purchase all of said lands, not theretofore released therefrom by it, at a price to be fixed by three arbitrators to be named at that time". The Court

hereby specifically finds that that [sic] is an appraisal provision which requires that appraisers fix the value of the lands as of the time of the appraisal; further, the Court hereby specifically finds that appraisers shall fix the value of the lands pursuant to the option provisions and that in making its determination about value the determination is to be unencumbered by any assumed continuation of the 1945 Agreement inasmuch as the option provision has been invoked.

¶21. On March 12, 1993, IP filed a memorandum in support of its motion for reconsideration, or to certify the orders for interlocutory appeal. Following Denmiss's motion to respond, Judge Graves denied the motion for reconsideration, but granted the motion to certify the orders for interlocutory appeal. On April 2, 1993, IP filed a notice of appeal in the Hinds County Circuit Court. Subsequently, this Court denied IP's request for interlocutory review.

¶22. On May 23, 1994, Denmiss and IP jointly requested U.S. District Court, Chief Judge William Barbour to appoint a third person to set an option price for the leased lands. On February 17, 1995, Chief Judge Barbour appointed James S. George to serve "as the third arbitrator."

¶23. On October 20, 1995, the appraisers reported that they had completed their appraisal and stated that Humphries and George agreed that the current value of the 113,500 acres of land was $38,500,000, but that Milliken did not agree and dissented to the value reached by Humphries and George. On October 23, 1995, IP requested that it receive a copy of the appraisers' written report. On October 26, 1995, George responded that it was the understanding of the majority of the appraisers that they were to merely determine an agreed value, and that no report would be forthcoming. On November 1, 1995, Milliken informed IP and Denmiss that he had valued the property at $13,770,000.

¶24. On November 1, 1995, IP filed a motion to set matters for jury trial. IP argued that, unlike an arbitration, which can be reviewed only on very narrowly defined grounds, an appraisal is reviewable both substantively and procedurally for mistakes of fact and to prevent injustice to either party. On December 14, 1995, Judge Graves entered an order and granted Denmiss's motion for entry of judgment. Graves found:

> Upon additional evaluation of the contract clause in question and considerable examination of relevant case law and theory, this Court determines that arbitration has indeed been completed byway of the appraisal process. Three appraisers were chosen in compliance with the contract clause of the 1945 agreement and this Court's previous orders. Two of the three appraisers agreed upon a fixed price of the lands in question and thus a price to exercise the option has been properly set. Defendants essentially contend that they were not given an opportunity to present evidence or challenge the decision of the appraisers in a hearing. Clearly, they viewed the process as an arbitration process as evidenced by the request for an evidentiary hearing. Said request was denied by the appraisers. That may be an issue for appeal, but it does not constitute sufficient grounds to grant a trial.

> It is the determination of this Court that the submitted purchase price of $38,500,000 by the appraisers is proper and Plaintiff's are entitled to judgment as a matter of law...Such judgment is final in accordance with Rule 54(b) of the Mississippi Rules of Civil Procedure.

## LOUISIANA AGREEMENT

¶25. Denmiss also brought suit for the 1945 Louisiana agreement and alleged that IP had breached the contract, that the purchase option was unenforceable, and that the contract was void. In the Louisiana agreement, Denkmann leased approximately 95,000 acres for ninety-nine years to Kraft, and included a near identical purchase option for the leased lands between 1986 and 1995. *IP Timberlands Operating Co., LTD. v. Denmiss Corp.*, 657 So. 2d 282, 288 (La. Ct. App. 1995), *writ den.*, 661 So. 2d 1348 (La. 1995). Both parties appealed the judgment following a four-month trial, in which the jury awarded Denmiss $100,000 as damages for violations of the agreement, and a later judgment notwithstanding the verdict (JNOV) awarded an additional $2,056,905 in damages. *Id*. at 287. On appeal, the Louisiana court noted the 1979 memorandum from Bennett, the forestry consultant, in which he states that there are areas of negotiation that may release a portion of the leased land. The Louisiana court found that the purchase option was not ambiguous, that the option was enforceable, and that IP's breaches of the contract were not so significant as to terminate the lease. *Id*. at 313-14.

## DISCUSSION OF THE ISSUES

¶26. Before proceeding, this Court must confront conflicting Mississippi case law in the area of arbitration. In *Jones v. Harris*, 59 Miss. 214 (1881), this Court said, "The right of either party to revoke a submission before award made, where the submission is not a rule of court, or regulated by statute changing the common law, is well settled and universally recognized." *See also Standard Mill Work & Supply Co. v. Mississippi Steel & Iron Co.*, 205 Miss. 96, 38 So. 2d 448, 451(1949); *McClendon v. Shutt*, 237 Miss. 703, 115 So. 2d 740, 741 (1959). In 1957, this Court stated:

> A good summary of the common-law rule, which exists in Mississippi and is applicable to this agreement, is set forth in 3 Am.Jur., Arbitration and Award, Sec. 31: 'So long as agreements to arbitrate, made in advance of the controversy, remain executory, different rules prevail than in the case of executed agreements. It is settled at common law that a general agreement, in or collateral to a contract, to submit to final determination by arbitrators the rights and liabilities of the parties with respect to any and all disputes that may thereafter arise under the contract is voidable at will by either party at any time before a valid award is made, and will not be enforced by the courts, because of the rule that private persons cannot, by a contract to arbitrate, oust the jurisdiction of the legally constituted courts...Whether the foregoing rule, which has variously been attributed to early jealously of the courts concerning the exclusiveness of their jurisdiction and to considerations of public policy, rests on a satisfactory basis has been questioned, but it has been so long settled that the courts are unwilling to disturb it.

*Machine Prods. Co. v. Prairie Local Lodge No. 1538 of Int'l Ass'n of Machinists, AFL-CIO*, 230 Miss. 809, 94 So. 2d 344, 348 (1957).

¶27. As recently as 1995, this line of case law was still alive. In *Arce v. Cotton Club of Greenville, Inc.*, 883 F. Supp. 117, 118 (N.D. Miss. 1995), the U.S. District Court recognized these cases as prevailing Mississippi law.

¶28. However, another line of case law has existed in Mississippi since at least 1917. This state, as a matter of public policy, has long allowed parties to arbitrate their differences and to give effect to an arbitration award. *Scottish Union & Nat'l Ins. Co. v. Skaggs*, 114 Miss. 618, 75 So. 437, 438

(1917). "That policy has even greater force in our present era of overcrowded judicial dockets. If there be any type of arbitration award we should be loathe to disturb, it should be that between private contracting parties respecting a matter of interest only to themselves and their respective pocket books." *Craig v. Barber*, 524 So. 2d 974, 977 (Miss. 1988). In *Hutto v. Jordan*, 204 Miss. 30, 36 So. 2d 809, 812 (1948), this Court stated:

> Articles of agreement to arbitrate, and awards thereon are to be liberally construed so as to encourage the settlement of disputes and the prevention of litigation, and every reasonable presumption will be indulged in favor of the validity of arbitration proceedings.

*See also Horne v. State Bldg. Comm'n*, 222 Miss. 520, 76 So. 2d 356, 358 (1954); *Stout v. W. M. Garrad & Co.*, 128 Miss. 418, 91 So. 33 (1922).

¶29. This Court hereby overturns the former line of case law that jealously guarded the court's jurisdiction. Again, we expressly state that this Court will respect the right of an individual or an entity to agree in advance of a dispute to arbitration or other alternative dispute resolution.

## I. WHETHER THE CIRCUIT COURT ERRONEOUSLY MADE A NEW CONTRACT FOR THE PARTIES AND VIOLATED THE FEDERAL ARBITRATION ACT?

¶30. IP contends that the purchase option expressly and unambiguously provided for three arbitrators to fix the value of leased lands, and that the circuit court erred in finding, as a matter of law, that the purchase option unambiguously contemplated appraisal. Further, IP contends that the lower court wrongly interfered with an arbitration agreement that is covered under the Federal Arbitration Act of 1925. And, of course, Denmiss contends that the lower court properly found that the agreement unambiguously called for the use of three appraisers to determine the value of the leased lands.

¶31. Before determining if the Arbitration Act applies and if it was violated, we must first determine if the purchase option is an arbitration or appraisal agreement.

## CONSTRUCTION OF THE PURCHASE OPTION

¶32. On the question of whether the instruments are unambiguous, and if so, their meaning and effect, we review the lower court's decision de novo for these two issues present questions of law. *Whittington v. Whittington*, 608 So. 2d 1274, 1278 (Miss. 1992)*; Lamb Constr. Co. v. Town of Renova*, 573 So. 2d 1378, 1383 (Miss. 1990); *Dennis v. Searle*, 457 So. 2d 941, 945 (Miss. 1984); *see also Moore & Munger Mktg. & Ref., Inc. v. Hawkins*, 962 F. 2d 806 (8th Cir. 1992); *Bennett v. Local Union No. 66, et al.*, 958 F. 2d 1429 (7th Cir. 1992).

¶33. In regard to contract construction, this Court has stated:

> "[T]he meaning of the language and intention of the parties to be determined by the Court is to be found in the language used in the instrument." *Id*.; *Pursue Energy Corp. v. Perkins*, 558 So. 2d 349, 351-53 (1990); *see also Simmons v. Bank of Mississippi*, 593 So. 2d 40, 42-43 (Miss. 1992) [in construing written instruments, "our concern is not nearly so much what the parties may have intended as it is what they said, for the words employed are by far the best resource for ascertaining intent and assigning meaning with fairness and accuracy," *quoting UHS-Qualicare v. Gulf Coast Comm. Hosp.*, 525 So. 2d 746, 754 (Miss. 1987) ]. Clear,

unambiguous instruments must be construed as written *Cherry v. Anthony, Gibbs, Sage*, 501 So. 2d 416, 419 (Miss. 1987). Courts must ascertain the meaning of the language actually used, and not "some possible but unexpressed intent of the parties." *Simmons*, 593 So. 2d at 42-43, quoting *Cherry*, 501 So. 2d at 416. The parties obviously disagree over that meaning, but that fact alone does not render the instruments ambiguous. *Id*.

*Whittington*, 608 So. 2d at 1278.

¶34. The purchase option expressly stated that the price was to be fixed by three arbitrators, not appraisal. Denmiss contends that the term "arbitrators" unambiguously contemplated appraisal, however, the purchase option is not necessarily ambiguous. Although, the analysis for an ordinary contract may end at the plain wording expressed, this Court has discussed the difficulty in determining if the parties' agreement actually contemplated arbitration instead of appraisal. In *Hartford Fire Insurance Company v. Jones*, 235 Miss. 37, 108 So. 2d 571, 572 (1959), this Court stated:

> Both sides have briefed this case on the theory that the report of the appraisers constituted an award under an arbitration agreement. It seems that all of the lawyers and the court completely overlooked the fact that the report of the appraisers is not an arbitration award. In 3 Am.Jur., Arbitration and Award, Sec. 3, at pp. 830-831, the distinction between the two is made quite clear. The report of appraisers fixing the amount of a fire loss is not an arbitration and award. We quote from the text cited: 'Arbitration is sometimes confused with other forms of procedure which have some points of similarity. For example, agreements in, or separate from, contracts, leaving to the decision of third persons questions of price, value, amounts, quantities, or qualities are not, strictly speaking, submissions to arbitration, nor are such third persons properly called arbitrators. Some of these so-called arbitrations are mere appraisements; others have some, many, or nearly all of the characteristics of arbitrations. All of them, in one or more particulars, differ from arbitrations. Appraisement, in particular, is perhaps most often confused with arbitration. While some of the rules of law that apply to arbitration apply in the same manner to appraisement, and the terms have at times been used interchangeably, there is a plain distinction between them. In the proper sense of the term, arbitration presupposes the existence of a dispute or controversy to be tried and determined in a quasi judicial manner, whereas appraisement is an agreed method of ascertaining value or amount of damage, stipulated in advance, generally as a mere auxiliary or incident feature of a contract, with the object of preventing future disputes, rather than of settling present ones. Liability is not fixed by means of an appraisal; there is only a finding of value, price, or amount of loss or damage. The investigation of arbitrators is in the nature of a judicial inquiry and involves, ordinarily, a hearing and all that is thereby implied. Appraisers, on the other hand, where it is not otherwise provided by the agreement, are generally expected to act upon their own knowledge and investigation, without notice of hearings, are not required to hear evidence or to receive the statements of the parties, and are allowed a wide discretion as to the mode of procedure and sources of information.'

¶35. Mississippi case law has not construed an arbitration provision to have had contemplated appraisal. Arbitration provisions are now recognized to be valid even before a dispute arises.

¶36. In what may be the best single source to derive intent, the 1945 agreement provided for the use of arbitrators in one other instance. Under the lease agreement, Kraft paid $1,000,000 on the day of the agreement and was obligated to make another payment to complete the transaction. Kraft had the option of paying a flat $1,250,000 to make complete consideration, or Kraft could elect to pay an amount that was to be based upon the amount of timber on the leased lands. To arrive at the total under the second option, the parties stipulated in the agreement to a set price for different types of lumber (for example, Kraft would pay $1.50 per one thousand feet of pine pulpwood, $7 per one thousand feet of hardwood sawtimber, etc.) that would be multiplied by the amount of timber estimated by a timber cruise. The agreement provided that the firm of Pomeroy & McGowin Estimators were to make an estimate of the timber upon the lands. However, if Pomeroy could not perform the estimate, then the parties were to each choose one arbitrator, and the two arbitrators were to agree on the third arbitrator. If the two arbitrators could not agree upon the third arbitrator, then the parties were to ask a U.S. District Court Judge of Mississippi to choose the third arbitrator. These three arbitrators were to select another firm of estimators.

¶37. Under this provision of the agreement, the use of the term "arbitrators" cannot be reconciled with the use of "appraisers". Although, arbitrators often are not limited to such a narrow decision as choosing another firm of timber estimators, the selection of an impartial and fair firm of estimators would be important to both Denkmann and Kraft. Thus, use of the term arbitrators in this provision more closely reflects that the parties did, in fact, contemplate arbitrators. These parties would not have chosen appraisers to choose an estimator. Denmiss admits that appraisers only engage in setting a value.

¶38. As stated earlier, the plain language of the purchase option provided for the price to be fixed by three arbitrators. Both Denkmann and Kraft were knowledgeable and experienced timberland companies, if they had intended any meaning other than arbitrators, they could have easily substituted such term.

¶39. Denmiss argues that the arbitration provision is merely a statement that the price is to be fixed by appraisal and that no hearing or other procedure was intended, therefore, Denmiss contends the agreement did not contemplate arbitration. In *Munn v. National Fire Insurance Co. of Hartford*, 237 Miss. 641, 115 So. 2d 54, 56 (1959), this Court held appraisers are not arbiters and that appraisers have no power to arbitrate disputes between parties other than to value the property. However, arbitrators conduct hearings, consider evidence and testimony, and could hire an appraiser before making their determination.

¶40. Further, Denmiss contends that if the parties had wanted to actually subject themselves to arbitration that the option would have expressly set out that the arbitrators would also dissolve any disputes between the parties in regard to price. Denmiss ignores that the term arbitrators inherently includes the investigation and procedures as applied by arbitrators. Possibly, the parties intended that the three arbitrators conduct a hearing, hire an appraiser(s) if they wanted and then fix the price of the lands.

¶41. This Court finds, as a matter of law, that the term 'arbitrators" as used in the purchase option does unambiguously mean arbitrators. This Court has long held that, "Articles of agreement to arbitrate, and awards thereon are to be liberally construed so as to encourage the settlement of

disputes and the prevention of litigation, and every reasonable presumption will be indulged in favor of the validity of arbitration proceedings." *Hutto*, 36 So. 2d at 812; *see also Horne*, 76 So. 2d at 358; *Stout v. W. M. Garrad & Co.*, 91 So. 33.

¶42. In construing the agreement, the plain language of the option provides for arbitrators, which must be construed in its ordinary meaning. Both Denkmann and Kraft were knowledgeable and experienced timber companies; thus if they had intended for appraisers to fix the value of the lands, they could have used the term appraisers instead of arbitrators. Another provision of the agreement provides for the use of arbitrators that is inconsistent with the term "appraisers". Although limited, this second provision for arbitrators is consistent with the use of disinterested and impartial persons to fairly decide an issue between the parties. Where a contract is clear and unambiguous, its meaning and effect are matters of law which may be determined by the court. *Pfisterer v. Noble*, 320 So. 2d 383, 384 (Miss. 1975). The decision of the lower court is reversed and remanded for proceedings consistent with the arbitration provision.

¶43. Even if we had determined that the term "arbitrators" did not unambiguously refer to arbitration, the lower court still erred. The lower court found, as a matter of law, that the term arbitrators unambiguously meant appraisers without any support or analysis for the finding. "Arbitration" and "appraisal" are both well defined and understood terms, and the use of "arbitrators" in the purchase option is unquestioned. As a matter of common sense, a word that has its own well defined meaning cannot be found to unambiguously mean another. Thus, arbitrators cannot unquestionably mean appraisers. Appraisal may be an issue in arbitration and may even be ordered, but pursuant to *Munn* appraisers can do nothing but value property. If the arbitration provision is found to be ambiguous and its meaning uncertain, questions of fact are presented which are to be resolved by the trier of facts after plenary trial on the merits. *Dennis v. Searle*, 457 So. 2d 941, 945 (Miss. 1984). Further, it is understandable that Kraft and Denkmann realized that if the option were exercised, each party would want the best possible price and disputes would be likely. Had the lower court found that "arbitrators" did not unambiguously call for the use of arbitrators, then the lower court necessarily found the term to be ambiguous.

## FEDERAL ARBITRATION ACT

¶44. Denmiss contends that the Arbitration Act does not apply because the parties did not intend for the lease agreement to be subject to the Act's provisions, and because the Act does not affect common law provisions to the contrary. Of course, IP contends that the Act does apply. The Federal Arbitration Act provides:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract. 9 U.S.C. § 2 (1976).

¶45. "In enacting § 2 of the Arbitration Act, Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration. Congress has thus mandated the enforcement

of arbitration agreements." *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984). The Arbitration Act, resting on Congress's authority under the Commerce Clause, creates a body of federal substantive law that is applicable in both state and federal courts. *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983). "The sine qua non of the FAA's applicability to a particular dispute is an agreement to arbitrate the dispute in a contract which evidences a transaction in interstate commerce." *Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.*, 867 F.2d 809, 813 n. 4 (4th Cir.1989).

¶46. Doubts as to the availability of arbitration must be resolved in favor of arbitration. *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983). "[U]nless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue, then a stay pending arbitration should be granted." *Wick v. Atlantic Marine, Inc.*, 605 F.2d 166, 168 (5th Cir.1979) (citing *United Steelworkers of Am. v. American Mfg. Co.*, 363 U.S. 564 (1960), and *Seaboard Coastline R.R. Co. v. National Rail Passenger Corp.*, 554 F.2d 657 (5th Cir.1977) (per curiam)).

¶47. In the case sub judice, we easily recognize that the timber industry, on a national level, meets the minimum threshold of affecting or bearing upon interstate commerce, and thus initiating the Federal Arbitration Act. Individually, the 1945 Mississippi agreement meets the minimum threshold to initiate the Act, because both Kraft and Denkmann held forest lands in multiple states, as evidenced by a second agreement between them for Louisiana lands. Contrary to Denmiss's position that Denkmann and Kraft did not elect into the Act's coverage, the Act mandates a policy favoring arbitration. Thus, the policy in favor of arbitration could only be cast aside if we had determined the purchase option was ambiguous. Mississippi case law regarding arbitration and the Federal Arbitration Act are consistent with one another. As discussed above, Mississippi has long observed a policy of favoring agreements to arbitrate, and this Court hesitates to disturb an agreement that knowledgeable and experienced parties freely enter into. Also, discussed above, we have determined that the purchase option unambiguously provided for three arbitrators to fix the value of the leased lands. These arbitrators will determine the value through one or more hearings, during which Denkmann and IP will have the opportunity to produce evidence in support of their respective positions. Further, the arbitrators may employ one or more appraisers to help in fixing the price of the leased lands.

¶48. In addition to establishing a strong presumption in favor of arbitration, the Act also limits the role of the court to determining whether an issue is arbitrable. The court's sole function is to determine whether the claim is referable to arbitration. Once that determination is made, the court may not delve further into the dispute. "The courts ... have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim." *United Steelworkers of Am. v. American Mfg. Co.*, 363 U.S. 564, 567 (1960).

### II. WHETHER THE CIRCUIT COURT'S $38,500,000 JUDGMENT, ENTERED WITHOUT AN EVIDENTIARY HEARING OR A TRIAL, WHICH ORDERED IPTO AND IP TO PAY TWICE FOR PROPERTY RIGHTS BOUGHT LONG AGO, DEPRIVED THEM OF PROPERTY WITHOUT DUE PROCESS OF LAW?

¶49. Although, we previously determined that the purchase option was indeed an agreement to

arbitrate, we believe it is proper for this Court to discuss the proper valuation method to be used by the arbitrators, and to clearly delineate Mississippi law.

¶50. The lower court determined that the purchase option intended for the appraisers to value the lands unencumbered by the remainder of the ninety-nine year lease. Ambiguity of a contract, or its terms and a contract's meaning and effect are issues of law that are reviewed de novo by this Court. *Whittington*, 608 So. 2d at 1274. This Court must construe the agreement as made by the parties and give the words of the document their commonly accepted meaning. If no ambiguity exists, this Court will accept the plain meaning of the instrument as the intent of the parties. Contracts are solemn obligations and the Court must give them effect as written.

## CONSTRUCTION OF THE TERM "WARRANTY"

¶51. IP argues Kraft acquired two estates in the leased lands under the 1945 agreement, which were later assigned to IP. IP states that prior to the 1992 exercise of the option, it owned all of the timber, trees, wood and other forest products on the land and that it owned the balance of the prepaid ninety-nine year lease expiring in the year 2044. IP contends that the lower court improperly instructed the appraisers not to consider the balance of the ninety-nine year leasehold interest, and that the improper instruction forced the appraisers to value the land as if it were unencumbered, which resulted in an appraisal of $38,500,000. Finally, IP states that the improper appraisal has forced IP to pay again for an interest that it purchased in 1945.

¶52. Denmiss contends that Kraft agreed "to purchase all of said lands, ...with warranty as in other instances." Further, Denmiss contends that the purchase option is consistent with the doctrine of legal merger, wherein IP's lessor estate merges into the greater estate and thereby terminated the lessor estate. Denmiss stated that if the parties had intended to value the lands encumbered with the remainder of leasehold interest that the purchase option would have so provided.

¶53. In 1958, this Court discussed the application of legal merger to contracts in Mississippi, and stated:

> We are not concerned here with the doctrine of legal merger. 'Indeed,' as stated in Pomeroy's Equity Jurisprudence, Fifth Ed., Vol. 3, p. 144, par. 787, 'the doctrine of legal merger is now practically extinct both in England and in the United States, for equitable principles are generally applied by the courts of both countries. The doctrine is not now operative, either at law or in equity, if thereby the intention of the parties will be frustrated.' Consequently, the courts will not compel a merger of estates where the party in whom the two interests are vested does not intend such merger to take place, or where it would be inimical to the interest of the party in whom the several estates have united. *Mobley v. Harkins*, 14 Wash.2d 276, 128 P.2d 289, 143 A.L.R. 88. It is undoubtedly true that, generally, a tenancy for years merges in a freehold estate, when the tenancy and the freehold are held by one person at one and the same time without any intermediate estate, and the lease is thereby terminated. 'Termination does not, however, always follow the acquisition of the landlord's title by the tenant. The question whether or not a merger affecting a termination of the lease results depends on what will best serve the interests of justice and the intention of the parties.' 51 C.J.S. Landlord and Tenant S 94, p. 666.

***Zouboukos v. Costas***, 232 Miss. 860, 100 So. 2d 781, 785 (1958).

¶54. In the case sub judice, if the leased lands were valued as encumbered, rather than unencumbered, the appraisal would be substantially less than $38,500,000. Accordingly, we will not enforce the doctrine of legal merger to terminate IP's interest without first determining the parties intent to terminate the encumbrance.[1]

¶55. Denmiss contends that usage of the phrase "with warranty as in other instances" shows the intent of the parties to convey the leased lands free of encumbrance from the remainder of the lease. Miss. Code Ann. § 89-1-33 provides that the word "warrant" without restrictive words in a conveyance has the effect of embracing all covenants known to common law: seisin, power to sell, freedom from encumbrance, quiet enjoyment and warranty of title.

¶56. If this were the only language pertaining to the quality of title to be sold contained in the 1945 agreement, our analysis would end. However, Denkmann agreed to "lease and lot unto KRAFT, with full warranty of title, the said lands for the full term of ninety-nine (99) years...with right to use said lands in the future, during the life of contract...the aforesaid consideration covering all such rights and privileges". In consideration, Kraft paid Denkmann $2,250,000, which represented the only cash that Denkmann was to ever receive under the lease. In the lease provision, the use of the term "warranty" is inconsistent with § 89-1-33, because a lessee cannot hold all covenants. Kraft was indisputably granted the right to use the leased lands for forestry purposes for ninety-nine years, undisturbed by Denkmann unless certain breaches occurred. Thus, Kraft was vested with the covenant of seisin or possession through the year 2044. *See **Standard Fruit & S.S. Co. v. Putnam***, 290 So. 2d 612, 615 (Miss. 1974); ***Collins v. Wheeless***, 171 Miss. 263, 157 So. 82 (1934); ***Crowell v. New Orleans & N. E. R. R.***, 61 Miss. 631 (1884). A lessee is vested with rights in the leased property and clothed with the same power of control and possessory rights as if they were the owner. ***Standard Fruit & S.S. Co.***, 290 So. 2d at 615. Thus, Denkmann no longer held all covenants of warranty.

¶57. This Court finds that the 1945 lease agreement gave IP a vested right to possession of the lands through the prepaid lease. Therefore the purchase option did not intend that a warranty deed could be conveyed by Denmiss because of their lack of having any possessory rights until 2044. The lower court erred, and the appraisers should have fixed the value of the encumbered lands. We find Mississippi law will protect the lessee, and we decline to enforce legal merger in the absence of clear intent to do so.

¶58. However, even if we had found that the agreement was inconclusive as to the parties intent, then the consideration of extrinsic evidence would be proper to determine their intent.

## CONSIDERATION OF EXTRINSIC EVIDENCE

¶59. In ***Baylot***, 147 So. 2d at 494 , this Court stated:

"Whenever the terms of a contract are susceptible of more than one interpretation, or an ambiguity arises, or the intent and object of the contract cannot be ascertained from the language employed, parol evidence may be introduced to show what was in the minds of the parties at the time of making the contract..." 20 Am.Jur., Evidence, Sec. 1147. The ambiguity may arise from words which are uncertain when applied to the subject matter of the contract.

*Traders' Ins. Co. of Chicago v. Edwards Post*, 1905, 86 Miss. 135, 38 So. 779.

¶60. Denmiss contends that, if the Court reaches this level of inquiry, supporting documents show the intent of the parties was for Kraft to pay fair market value for the land. Denmiss contends that the 1946 purchase option, $3.50 per acre, exceeded the land's fair market value before the lease went into effect. In support, Denmiss cites two letters, both written before the execution of the agreement in which Denkmann valued the lands at $2.47 per acre and Kraft valued the land at $3.00 per acre. Although these letters may be authentic, they do not help to ascertain the parties' intent when the agreement was executed, because they are do not reflect the parties intent.

¶61. Denmiss cites another letter, written by W. H. Giles on August 30, 1945, again prior to when the agreement was reached, in which he stated that he and another Denkmann representative met with IP in which the parties discussed a lease with a purchase to buy. Giles stated, "[a] ninety-nine year lease with an option to them to buy the land on or after forty years at the appraised price at that time will be satisfactory..." However, this letter, too, pre-dates the agreement and therefore it does not embody the final agreement between Kraft and Denkmann.

¶62. As stated in the facts above, the record contains letters from former President Hauberg and Vice-President Giles of Denkmann who were specifically authorized to lease the subject lands to Kraft. These letters, written in the years following the agreement, indicate their understanding of the final agreement.

¶63. In 1960, Giles, acting in his capacity as an Agent, wrote to the Denkmann distributees and urged them to approve a condemnation sale to the state. Giles described the Denkmann distributees as owning a reversionary interest in the land, because the lands were under a lease with IP that would not expire for another eighty-five years. Giles stated that the distributees should approve a settlement in which Denkmann would receive $10 per acre, and IP $37 per acre. The distributees approved the agreement, and subsequently the Ross Barnett Reservoir was constructed.

¶64. In the 1970's, Ewing, another Agent for the Denkmann distributees, wrote several letters and stated that the Denkmann lands are under a ninety-nine year paid-up lease, which made valuing the reversionary interest difficult. However, the most helpful letter to determine the parties' intent was written by Hauberg, the former President of Denkmann and an Agent for the distributees. In 1979, Hauberg wrote the Denkmann distributees and Denmiss shareholders and stated, "I.P. is in the driver's seat because its lease will not expire until 2044. If it buys our lands, it will not be offering the current market value of the lands that it can have the tree use of for another 50-60 years, having paid us for the lease back in 1945."

¶65. These letters from Denkmann officials indicate a clear understanding that IP held a pre-paid lease through 2044, which left Denkmann with only a reversionary interest in the lands. Hauberg stated that IP would not offer fair market value of the lands because of the vested leasehold encumbrance until 2044.

¶66. This Court finds that there is no doubt the parties intended for the lands to be valued under the purchase option at their encumbered value. Letters from Denkmann officials who were specifically and expressly authorized to enter into the agreement with Kraft clearly express this construction. Therefore, the circuit court erred.

## III. WHETHER THE ORDERS AND JUDGMENT ENTERED BELOW WERE PROCEDURALLY DEFECTIVE?

¶67. As discussed earlier, the circuit court erred in its construction of the purchase option to unambiguously provide for appraisal rather than the expressed arbitration provision. Further, the lower court erred in determining, as a matter of law, that the lands were to be valued as unencumbered by the vested leasehold interest. Thus, the lower court erred in entering judgment in favor of Denmiss.

¶68. Two smaller issues will be discussed here. First, Denmiss presented land deeds to IP which specifically reserved sand and gravel. In turn, IP refused to accept the deeds because the purchase option did not specifically preserve their reservation. However, Denmiss contends that the purchase option gave Denkmann full reservation of all minerals including sand and gravel, because under the lease agreement, Denkmann had reserved unto itself mineral rights, specifically including gravel. Denmiss reasons that sand is of like kind and character as gravel and thus sand is also reserved.

¶69. A review of the record does not indicate that this issue was presented or litigated in the lower court. Denmiss did not contend that they were entitled to sand and gravel until after the lower court found the appraisal to be correct and ordered IP to accept the deeds. Because the lower court did not expressly rule upon this issue, this issue is not properly before this Court. Upon remand, the lower court should conduct a hearing to determine if sand and gravel were reserved by Denkmann.

¶70. Second, IP contends that the Hinds County Circuit Court was an improper forum for this suit. IP asks that the suit be remanded to a chancery court in a county in which some of the lands are located. IP points out that none of the lands are within Hinds County. IP contends that suits involving real property should be brought in the chancery court of the county in which the lands can be found. Miss. Code Ann. § 11-5-1 provides that suits respecting real property may be brought in the chancery court in which the real property is found, and in other cases, suit may be brought in the county in which the defendant may be found.

¶71. IP brought suit in the Leake County Chancery Court for a declaration of its rights, later Denmiss brought suit against IP in the Hinds County Circuit Court for breach of contract and recission. After the Leake County Chancery Court transferred the chancery court action to the Hinds County Chancery Court, the Hinds County Chancellor transferred the suit to the circuit court for judici al efficiency because suits were pending in both courts arising from the same set of facts and circumstances. This case is before us in a Rule 54(b) certification from Hinds County Circuit Court, and as stated other issues are still pending there between these parties. Thus, the sand and gravel issue should be remanded to the same court.

¶72. It is clear that if one issue is properly before the circuit court it has jurisdiction to decide all issues. The leading case discussing pendent jurisdiction of the circuit court is ***Hall v. Corbin***, 478 So.2d 253 (Miss. 1985). That case involved the scope of jurisdiction and available remedies in circuit court ancillary to a replevin action. The Court stated:

> We (and every other court in the land) have long held that once a court acquired actual subject matter jurisdiction of an action, other claims (whether asserted by one or more of the original parties or by new or intervening parties), ancillary or pendent to the original claim could also be

litigated in that action even though the ancillary or pendent claim standing alone may have been beyond the court's jurisdiction. To fall within pendent or ancillary jurisdiction, the intruding claim must arise out of the same transaction or occurrence as the principal claim or, as others put it, out of a common nucleus of operative fact. The principal context in which we have recognized these notions is that where "legal claims" have been asserted in chancery court, pendent tot he principal equity claim. There is no reason or principle why the converse should not also be true: where a circuit court has jurisdiction of an action at law, it may hear and adjudicate in that action all claims, including those with an equitable smell, arising out of the same transaction and occurrence as the principal claim. Indeed, the converse would appear even more appropriate in that our circuit courts are courts of general jurisdiction, while our chancery courts are regarded as courts of special or limited jurisdiction.

*Hall v. Corbin*, 478 So.2d at 255.

¶73. The fact that issues are pending in the Hinds County Circuit Court gives that court pendent jurisdiction to hear the sand and gravel issue which is being remanded by this Court. Certain of the pending issues involve claims by IP that Denmiss breached the contract in bad faith. Since this is the same contract which gives rise to the sand and gravel issue, it can fairly be said that this issue arises from the same transaction or occurrence as the pending claims. Thus, jurisdiction is proper. *Accord Gibson v. Mauel*, 534 So.2d 199, 200 n.2 (Miss. 1989) (circuit court could consider motion for preliminary injunction); *Dye v. State*, 507 So.2d 332, 337-38 (Miss. 1987) (circuit court could hear claims for equitable relief). *See also* *McDonald v. Holmes*, 595 So.2d 434, 437 (Miss. 1992) ("[w]e have made clear that our trial courts, chancery and circuit, have full jurisdiction to adjudicate all claims in a single action without regard to whether they arise in equity or at law").

¶74. There is no compelling reason to require litigation of the sand and gravel issue, which is essentially a matter of contract interpretation, in a court other than the one in which related issues are still pending and in which any final arbitrator's award may be filed for judgment.

## CONCLUSION

¶75. We have construed the 1945 lease agreement and purchase option and have found that the lower court erred in finding as a matter of law that the arbitration agreement, pursuant to the purchase option, unambiguously called for appraisers. Further, the lower court erred in finding, as a matter of law, that the parties intended for the land to be given an unencumbered value.

¶76. This Court finds that the parties unambiguously entered into an agreement to fix the value of the lands by use of arbitrators. Also, the 1945 lease agreement gave IP a possessory interest in the land through the year 2044, which interest could not be divested by Denmiss. Further, letters by Denkmann officials, who entered into the 1945 agreement, unequivocally show the parties' understanding that IP had prepaid the lease agreement, and upon exercise of the option to purchase that IP would pay the encumbered value of the land. In the absence of a ruling by the lower court, we will not review the issue of the alleged reservation of sand and gravel. Because issues are still pending in Hinds County Circuit Court, it has pendent jurisdiction to hear the sand and gravel issue which is being remanded by this Court.

¶77. **REVERSED AND REMANDED TO THE CIRCUIT COURT OF HINDS COUNTY.**

**PRATHER, C.J., PITTMAN, P.J., BANKS, SMITH AND MILLS, JJ., CONCUR. McRAE, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY SULLIVAN, P.J. WALLER, J., NOT PARTICIPATING.**


### McRAE, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:


¶78. I concur with the majority's decision to reverse and remand the case to the Circuit Court of Hinds County. However, I disagree with the finding that the Federal Arbitration Act is applicable and question why, instead, the arbitration provisions of Miss. Code Ann. § 11-15-1 et seq. were not considered. I further do not join the majority's overruling of a line of cases which it perceives as creating an incongruity in our law of arbitration.

¶79. I do not agree with the majority's conclusion that the Federal Arbitration Act is applicable to the case *sub judice* merely because "the timber industry on a national level, meets the minimum threshold of affecting or bearing upon interstate commerce" and because both Kraft and Denkmann, the parties to the original agreement, held timberlands in several states. To so find makes a federal case, for all intents and purposes, out of a simple Mississippi land contract. The 1945 agreement at issue expressly covered only those timberlands located in Madison, Rankin, Scott, Leake and Neshoba Counties in Mississippi. The Louisiana land holdings were covered by a separate contract and were the subject of a separate lawsuit. *See IP Timberlands Operating Co., Ltd. v. Denmiss Corp.,* 657 So. 2d 282 (La. Ct. App. 1995). While I agree that the 1945 agreement unambiguously provides for arbitration, I would find that the arbitration provisions of Miss. Code Ann. § 11-15-1 (1972) are applicable, and not the Federal Arbitration Act.

¶80. I further disagree with the majority's decision to overrule those cases which "jealously guarded the court's jurisdiction" over arbitration cases. Again, looking at the arbitration provisions set forth in Miss. Code Ann. § 11-15-1 et seq., the circuit court has jurisdiction to confirm, modify, correct and even vacate arbitration awards. *See* Miss. Code Ann. §§ 11-15-125, 129, 133, 135 and 137. Neither these provisions nor the case law can be construed as impinging upon the individual's right to utilize arbitration as a means of alternative dispute resolution.

¶81. The original agreement called for the timberlands at issue to be valued by three arbitrators. That was done and a valuation of $38.5 million was established. As the circuit court found, to that extent, the purchase agreement should be honored.

**SULLIVAN, P.J., JOINS THIS OPINION.**


1. Consideration of the parties intent is consistent with cases presented by both parties. *See Lassiter*

*v. Kaufman*, 581 So. 2d 147 (Fla. 1991); *Klair v. Reese*, 531 A. 2d 219 (Del. 1987); *TCC Enters. v. Estate of Erny*, 717 P. 2d 936 (Ariz. 1986); *Summit Industrial Equip., Inc. v. Koll/Wells Bay Area*, 230 Cal. Rptr. 565 (1986); *Petters Diner, Inc., v. Stellakis*, 493 A. 2d 1261 (N.J. 1985).